SLATTON v. HILL.

4-9803                                    251 S. W. 2d 123

Opinion delivered June 16, 1952.

Rehearing denied October 6, 1952.

*Alfred Featherston* and *F. C. Crow,* for appellant.

*Weisenberger & Wilson,* for appellee.

GRIFFIN SMITH, Chief Justice. The jury returned a plaintiff's verdict for $390 on a complaint asking $747.10 as treble damages for wilfully cutting and removing timber. In a cross-complaint the defendants Slatton sought treble damages for $40 worth of timber they claimed the plaintiff Hill cut from their land. By failing to make an award on this item the jury necessarily found for the plaintiff as cross-defendant, or without itemization reduced Hill's judgment by way of a set-off.

The appellants contend (1) that the court erred in not giving certain requested instructions, (2) that the verdict is not substantially supported by the testimony, and (3) discretion was abused when a final motion for a new trial was refused in the face of allegations, affidavits and other documents not available when the cause was tried and not known to the defendants or their counsel. Insistence is that if this supplementary evidence had been before the jury it would have disproved facts upon which the verdict was predicated.

Bruce Bottoms on the south side of the Little Missouri River is low land heavily wooded in many areas. In 1943 Barto Hill purchased the southeast quarter of the northwest quarter of section 26, etc. He was unable to locate any definite markers defining the north line. Appellant Frank Slatton later acquired the timber on forty

acres belonging to the York heirs. The southeast corner of this land was the northwest corner of Hill's forty. In the briefs it is stated that a fence ran east and west along the south side of the York land. J. R. Harris owned the forty immediately north of Hill's southeast northwest quarter and Slatton bought the timber on that tract. Lyman Slatton was named as a defendant in this suit because he cut and removed the timber.

In 1944 Hill employed Ben Nolen to cut the timber from the tract purchased by Hill a year earlier. At that time Hill, his brother, and his father were operating a small sawmill. Because Nolen could not be sure of the north line of the northeast quarter of the southwest quarter, he declined to cut the timber; whereupon appellee's father and a brother and a third person endeavored to locate the point of division by harmonizing their lines with points they thought had been accepted for many years; but, in an effort to avoid trespassing on their neighbor to the north, they went on the Watson forty to the east of the northeast southwest quarter, then walked thirty steps south in order, as they believed, to be certain not to trespass on the property to the north, then sighted due west and blazed a trail. While Harris owned the forty immediately north of Hill there was no controversy between the two.

In 1949 a group of landowners, including Hill, employed Gordon Prescott, surveyor for Hempstead county, to demark a quarter section line so that the Soil Conservation Agency could construct a drainage ditch. This line, at the time established, was supposed to be the dividing point between Hill's forty and Slatton's property. Hill and his brother cut timber from a narrow strip. This occurred after Slatton had purchased timber rights pertaining to the Harris forty. Slatton complained that the line established for irrigation purposes was erroneous and asked Hill to discontinue his timber operations.

In December, 1949, Gordon Prescott, then county surveyor, made a survey, starting, as he believed, from a point known to Slatton. These operations took the surveyor to a point half a mile west of the northwest corner

of the southeast quarter of the northwest quarter. The measurements carried Prescott three feet north of the soil conservation line. The operations were discontinued at Slatton's request. The contention is that Slatton then went with Prescott to what was thought to be the northwest corner of section 26. From there they measured south and arrived at a point three feet south of the soil conservation survey. Hill agreed to accept either point and abide the result of extensions for the purpose of determining his northern boundary, but Slatton refused. Five or six months later the Slattons cut the pine and oak from the disputed strip lying between the soil conservation line and the line established by Hill when Nolen, in 1944, asked that the property on which he was cutting timber be definitely outlined.

It is Hill's contention that he went to see Slatton at his home in Pike county, complained that the timber Slatton was cutting was on the southeast quarter of the northwest quarter, undertook to arrive at an amicable settlement, but failed in this endeavor. After these conversations the timber was hauled away by the Slattons. Thereafter (June 12, 1951) Hill sued for compensation under the provisions of Ark. Stat's, Sec. 50-105. Subsequently Hill employed Prescott to establish corners from which the north line of the southeast quarter of the northwest quarter could be identified. In appellee's brief it is said that this Prescott survey "corresponded with the soil conservation line, but the northeast corner was 16 feet farther west than where some one had run the line." In the interim Hill purchased the Carrie Watson forty. Counsel for Hill state the controversy in this way: "Appellants cut the timber east up to the Prescott line between Harris and the Watson forty, and not only came south of the corners Prescott set, to haul out the timber already cut, but also cut and hauled away 1,745 more feet of oak, making 4,698 feet taken in all. Thus we see that appellants accepted Prescott's line on the east when it was to their advantage, and ignored it on the south."

Timber alleged by the Slattons to have been erroneously cut by Hill was, they say, taken from the northwest quarter of the northwest quarter of Section 26.

In writing an opinion such as this it is realized that lawyer, layman, or abstracter, in reading the opposing contentions, will have difficulty in understanding the physical layout without reconstructing the lines. Rough drawings and the reproduction of an aerial map are included as exhibits. The result, however, is that a factual question was presented and the jury's findings in favor of Hill for slightly more than half of what was claimed cannot be disturbed on appeal when supported by substantial evidence, unless erroneous instructions were given.

Appellants call attention to fundamental rules for subdividing sections and cite Clark on Surveying, Sec. 371, and comments by the author, one being that "The surveyor should never allow himself to be coaxed into making a survey by a reference to one or two corners only, as it is wholly unwarranted." The Slattons contend that the old government surveys and field notes not available to them when the trial was had will show that Prescott's survey is erroneous. One contention is that the government surveyors used a variation differing by two degrees from the variant used by Prescott, and that well-known points were ignored in favor of Prescott's conclusions that in subdividing an appropriate beginning was had.

In the motion for a new trial it was asserted that an old survey made by C. G. Richardson would show the errors complained of in Prescott's survey. It had been ascertained that Richardson was dead, but information was at hand showing that his son had retained field notes of the survey. Other matters were urged in support of a new trial. We think, however, that issues within the court's discretion were presented, and that denial of the motion was not error. It is also argued that the court erred in refusing to give appellants' instructions 1 through 7. There was no prejudice in this respect because other instructions substantially covered the issues advanced.

Affirmed.

Mr. Justice McFADDIN not participating.